# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| CHRISTOPHER CILLIE,<br>    *Plaintiff*,<br><br>    v.<br><br>RYAN MCCARTHY, SECRETARY OF<br>THE ARMY,<br>    *Defendant*. | No. 3:19-cv-334 (VAB) |

## RULING AND ORDER ON MOTION TO DISMISS

Christopher Cillie ("Plaintiff") has sued Ryan McCarthy, Secretary of the Army

("Secretary McCarthy" or "Defendant"), in his official capacity, alleging violations of the

Administrative Procedure Act, 5 U.S.C. § 706 ("APA") and violations of his due process rights

under the Fifth Amendment of the United States Constitution.[1] Compl. at 14–16, ECF No. 1

(Mar. 7, 2019).

Secretary McCarthy has moved to dismiss the Complaint for lack of jurisdiction. Mot. to

Dismiss, ECF No. 11 (Sept. 3, 2019) ("Def.'s Mot.").

For the following reasons, the motion to dismiss is **GRANTED.**

---

[1] Mr. Cillie originally named Mark T. Esper, then Secretary of the Army, as Defendant. *See* Compl., ECF No. 1 (Mar. 7, 2019). Subsequently, the President nominated and the United States Senate confirmed Mr. Esper as the United States's Secretary of Defense, and the President nominated and the United States Senate confirmed Ryan McCarthy as Secretary of the Army. *See Dr. Mark T. Esper, Secretary of Defense*, U.S. DEP'T OF DEFENSE, https://www.defense.gov/Our-Story/Biographies/Biography/Article/1378166/dr-mark-t-esper/ (last visited Aug. 9, 2020); *Secretary of the Army Ryan D. McCarthy*, ARMY.MIL, https://www.army.mil/leaders/sa/bio/ (last visited Aug. 9, 2020). The Court therefore has added Mr. McCarthy as Defendant in this case. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."); *Williams v. Annucci*, 895 F.3d 180, 187 (2d Cir. 2018) ("[W]hen a 'defendant in an official capacity suit leaves office, the successor to the office replaces the originally named defendant.'" (quoting *Tanvir v. Tanzin*, 894 F.3d 449, 459 n.7 (2d Cir. 2018)). The Clerk therefore will be ordered to terminate Mr. Esper as a party.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations[2]

Mr. Cillie is a veteran of the United States Army ("Army"), Compl. ¶ 3, currently serving

as a Lieutenant Colonel in the United States Army Reserve, and living in Cheshire, Connecticut.

Def.'s Ex. A, ECF No. 11-2 (Sept. 3, 2019) (Declaration of Kenneth Clayton, Paralegal

Specialist with the U.S. Army Legal Services Agency, and attachments) ("Clayton Decl.").[3] For

more than twenty years, Mr. Cillie allegedly received payments from the Army for his duty by

direct deposit. Compl. ¶ 8.

In December of 2012, Mr. Cillie allegedly interviewed for an Army instructor position

with Lieutenant Colonel ("Lt. Col.")[4] Michael Morris. Compl. ¶ 5.

In the fall of 2013, Mr. Cillie received a phone call from Lt. Col. Jeffrey Thurber stating

that he would "shortly be assigned as a student instructor at the New London, CT site" for

---

[2] Factual allegations are drawn from the Complaint, documents incorporated by reference, and matters in the public record of which the Court takes judicial notice. *See Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal citation and quotation marks omitted)).

[3] Mr. Clayton declares that, "[a]s part of [his] official duties, [he] ha[s] access to the military personnel files of current and former members of the Army" and reviews such files "for ongoing civil litigation related to military personnel matters." Clayton Decl. ¶ 2. He declares that he "personally conducted a search of the ACTS database using the Plaintiff's name and social security number" and that Mr. Cillie "is an officer—a Lieutenant Colonel—in the U.S. Army Reserve." *Id.* ¶ 5.

The Court takes notice of documents regarding Mr. Cillie's employment with the United States Army. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) ("[T]he harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered. Accordingly, where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." (internal quotation marks omitted) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002)).

[4] Plaintiff refers to the acronym "LTC," which Defendant has defined "LTC" as "Lieutenant Colonel" *See* Def.'s Mem. at 5–6 (identifying both Mr. Cillie and Mr. Thurber as "Lieutenant Colonel ('LTC')").

Intermediate Level Education (ILE) instruction. *Id.* ¶ 6. Soon thereafter, he received an assignment and began instructing ILE students in New London. *Id.* ¶ 7.

"Beginning with the first payment for drill attendance subsequent to" Mr. Cillie's teaching assignment, he allegedly began receiving his payments by physical check, with allegedly no explanation as to why his direct deposit had been stopped. *Id.* ¶ 8.

Mr. Cillie allegedly raised these issues with his supervisor, Lt. Col. Michael Higgins, "who [allegedly] indicated caution in working with full time staff." *Id.* ¶ 10. Lt. Col. Higgins allegedly told Mr. Cillie about a student instructor at the New London site who had experienced difficulties attempting to attend Faculty Development (IFD) training that was required for instructors. *Id.* That instructor allegedly waited for eighteen months as an instructor without attending the required IFD training. *Id.*

In November and December of 2013, Mr. Cillie allegedly "attended to various readiness requirements to support the commander . . . by becoming 'green' for reporting status." *Id.* ¶ 11. These requirements "included mental, dental, and weapons qualification." *Id.* "Weapons qualification was [allegedly] unusual[,] as it required travel to Massachusetts to qualify at a private range using a weapon privately owned by another member of the unit" named Paul, whose last name Mr. Cillie does not recall. *Id.* Mr. Cillie allegedly "paid for the ammunition used for weapons qualification out-o[f]-pocket, paying Paul for rounds expended while using his weapon." *Id.*

Mr. Cillie also "sought a seat for IFD training" as part of his effort to "become green" to support the commander. *Id.* ¶ 12. He received notice from Sergeant First Class ("SFC") Polanco that he "had a reserved slot for IFD training between March 10, 2014 and March 15, 2014—which would require travel on March 9, 2014," along with an application for a government travel

3

credit card, which would be necessary for his travel. *Id.* Mr. Cillie allegedly completed and returned the credit card application and coordinated with his employer to be out of the office for week of March 10, 2014. *Id.*

By Friday, March 7, 2014, Mr. Cillie had allegedly not received orders for IFD training or any information indicating travel arrangements had been made. *Id.* ¶ 13. He therefore allegedly "unwound [his] coordination with [his] employer to be out of the office the next week," and went to the New London site for the "battle assembly" scheduled the next day, Saturday. *Id.*

On that Saturday, March 8, 2014, Mr. Cillie told Lt. Col. Thurber and Lt. Col. Higgins that he had no orders for travel for IFD training. *Id.* ¶ 14. Lt. Col. Thurber allegedly tried to help and "sympathized with the problem of order generation in the unit generally" and "indicated that orders ha[ve] historically [been] an in issue in the unit." *Id.* ¶¶ 14–15. Mr. Cillie also allegedly spoke with SFC Polanco by phone that day, who allegedly stated that he had sent orders for IFD training by e-mail on February 29, 2014; but that was "impossible because 2014 was not a leap year." *Id.* ¶ 16.

During the afternoon of March 8, 2014, Mr. Cillie allegedly spoke with Lt. Col. Morris about the issues with generating his order for IFD training. *Id.* ¶ 17. Lt. Col. Morris allegedly "indicated a desire to fire drill the matter—that is[,] to apply direct pressure to [Mr. Cillie] to travel that day to attend the training in concert with energizing SFC Polan[c]o to generate an order." *Id.* Mr. Cillie allegedly indicated to Lt. Col. Morris that "such pressure was unacceptable" and "an improper response to the root cause of the problem[:] . . . administrative dysfunction." *Id.*

On March 9, 2014, Mr. Cillie allegedly submitted a form to Lt. Col. Higgins requesting to be transferred. *Id.*

4

On March 10, 2014, Mr. Cillie allegedly requested an inquiry into the unit's alleged failure to timely generate an order for training, which allegedly resulted in his inability to attend training. *Id.* ¶ 19.

On the same day, Mr. Cillie allegedly received the government travel credit card for which he had applied. *Id.* ¶ 18. Sometime thereafter, he allegedly received a credit card statement indicating that he owed for a charge on the card which he allegedly did not incur. *Id.*

On March 29, 2014, Lt. Col. Higgins allegedly sent Mr. Cillie a text message informing him that the March 2014 "class/drill" with the unit would be his last. *Id.* ¶ 20.

On March 31, 2014, Mr. Cillie allegedly sent a letter to Lt. Col. Morris asking for assistance getting the charge removed from his credit card. *Id.* ¶ 18. Lt. Col. Morris allegedly refused. *Id.*

Thereafter, Mr. Cillie allegedly conducted his own research and learned that, by regulation, when applications for government travel credit cards are expedited for individuals scheduled to travel within five working days, a fee for expedited travel will be charged to the account; that "special efforts" must be taken "to make the cardholder aware that a fee for expedited travel will be charged to the account[;] and [] that cardholders can claim reimbursement of a fee for expedited service in the event that scheduled travel does not occur." *Id.* ¶ 21. He also allegedly learned that it was common practice for credit card applications to be sent to unit members pre-filled with authorizations for expedited card delivery. *Id.*

Since his travel allegedly did not occur, Mr. Cillie allegedly submitted a reimbursement request consistent with the regulation. *Id.* ¶ 22. He allegedly attached a letter "gently inquir[ing]" whether "the rules for expedited service set forth in the regulation" had been followed. *Id.*

Later, Mr. Cillie allegedly received a letter and a check from Lt. Col. Morris for $20, which he interpreted "as payment for silence on the issue of waste in the [government travel credit card program] for unnecessary expedited applications." *Id.*

On June 9, 2014, Lt. Col. Higgins allegedly sent Mr. Cillie an e-mail with "a 17-day order for annual training commencing on June 12, 2014." *Id.* This e-mail allegedly surprised Mr. Cillie, as he thought based on Lt. Col. Higgins's last communication that his last "class/drill" with the unit had been in March. *Id.* He allegedly responded to the e-mail stating that he was unable to attend the annual training on such short notice. *Id.*[5]

In late June or early July of 2014, Mr. Cillie allegedly received a check in the amount of $4,170.09. *Id.* ¶ 24. Mr. Cillie allegedly believed that "an unidentified individual made a false claim for pay and benefits in connection with the" annual training and that he had received the check in error. *Id.* He allegedly "safeguarded the check until the end of the fiscal year with some expectation that the error would be corrected at the close of the fiscal year," but when he received no indication of a correction, he allegedly returned the check "with a letter indicating that the wrongful payment was indication of further waste and abuse of authority . . . , and requesting correction of [his] pay records." *Id.* Subsequently, however, "[i]nstead of correcting [his] pay records," the Army allegedly took steps to collect a debt against Mr. Cillie "in the amount of $5,817.30 . . . on each subsequently received [leave and earnings statement]." *Id.*

In April of 2015, Mr. Cillie allegedly discovered that an evaluation had been placed in his personnel file that was "referred," or marked negative, based on his "failure to attend battle

---

[5] Mr. Cillie alleges that "[c]orrespondence from LTC Scarcella, successor LTC Morris in command, indicates that the AT order was a personal action undertaken on his part as a consequence, apparently for not transferring to the IRR in response to being excluded from training." Compl. ¶ 23.

assemblies in March, April, and May of 2014; failure to attend IFD training; and non-attendance at annual training." *Id.* ¶ 25.

On April 24, 2015, Mr. Cillie allegedly sent a letter requesting that a commander's inquiry be conducted into the referred evaluation and "identifying errors associated with administrative inefficiency in the unit." *Id.* ¶ 26. Allegedly, no inquiry took place.

On July 21, 2015, Mr. Cillie allegedly sent another letter requesting a commander's inquiry. *Id.* ¶ 27. He then allegedly received a message from a JAG Officer indicating that a commander's inquiry would be conducted, but allegedly no inquiry resulted. *Id.*

On September 2, 2015, as allegedly discovered later by Mr. Cillie, Lt. Col. Scarcella allegedly initiated an involuntary separation process against Mr. Cillie. *Id.* ¶ 33.

In December of 2015, Lt. Col. Zupfer allegedly contacted Mr. Cillie and "indicated that he was tasked with responding to [Mr. Cillie's] letter," but allegedly refused to interview Mr. Cillie unless Mr. Cillie waived his privacy rights. *Id.* ¶ 28.

In May of 2016, Lt. Col. Zupfer allegedly sent a report to Mr. Cillie denying that there were any errors in Mr. Cillie's record. *Id.* ¶ 29. The report allegedly specifically stated that the debt collection against Mr. Cillie was valid and that "no evidence had been identified indicating" that Lt. Col. Morris had told Mr. Cillie to stop attending drills. *Id.* The report allegedly included, however, two attachments: (a) a statement from Lt. Col. Higgins stating that Lt. Col. Morris had directed Mr. Cillie to stop attending drill, either directly or through Lt. Col. Higgins; and (b) an e-mail from Lt. Col. Morris to another officer stating that "he had decided to no longer allow [Mr. Cillie] to remain in the unit" after Mr. Cillie allegedly declined Lt. Col. Morris's March 8 proposal to "fire drill" his travel for training on March 9, 2014. *Id.* The report also allegedly included evidence that, sometime after March 8, 2014, Lt. Col. Morris had canceled an order for

Mr. Cillie to attend an annual training "train up" event scheduled for April of 2014. *Id.* ¶ 32. The report allegedly stated finally that, due to a change in regulation after Mr. Cillie submitted his request, a commander's inquiry was not required. *Id.* ¶ 31.

By letter dated November 23, 2016, Mr. Cillie allegedly received a Notification to Appear Before Administrative Board of Officers ("Notification"), which enclosed the form by which Lt. Col. Allegedly initiated involuntary separation against Mr. Cillie in September 2015. *Id.* ¶ 33. The Notification also allegedly "included a screenshot from the Unit Readiness Reporting system [allegedly] indicating that, at the time" Lt. Col. Morris had allegedly excluded Mr. Cillie from drills, he and Lt. Col. Higgins were entering false data. *Id.* ¶ 34. The Notification allegedly did not ultimately result in Mr. Cillie's separation. *Id.* ¶ 33.

On November 28, 2016, Mr. Cillie allegedly submitted a Whistleblower Reprisal Complaint asserting that (a) he was excluded from class/drill beginning in March 2014 after notifying superiors of the lack of an order for IFD training; (b) his orders to attend the annual training "train up" event scheduled for April 2014 were cancelled; and (c) he was reassigned "from an instructor position to 'excess' immediately after requesting a commander[']s inquiry in April of 2015." *Id.* ¶ 35.

On December 14, 2016, Mr. Cillie allegedly received notification from the Directorate for Whistleblower Reprisal Investigations ("WRI") that it had declined to initiate an investigation into the allegations in his complaint. *Id.* ¶ 36.

On January 24, 2017, Mr. Cillie allegedly received a letter from the Investigations Division of the Office of the Inspector General stating that, under Department of Defense Directive 7050.06, "no investigation is required when a service member submits a reprisal complaint more than one year after the date that the member became aware of the personnel

action that is the subject of the allegation," and therefore that Mr. Cillie's November 2016 complaint regarding actions in 2014 and 2015 was untimely. *Id.* ¶ 37.

On January 30, 2017, Mr. Cillie allegedly sent a letter responding to the Investigations Division, "pointing out errors and injustice in the findings set forth in the letter of January 24, 2017." *Id.* Mr. Cillie does not allege what those errors were. The Investigations Division allegedly did not respond. *Id.*

On April 10, 2017, Mr. Cillie submitted an application to the Army Board for Correction of Military Records ("ABCMR") requesting that multiple corrections be made to his military record, including regarding the Mr. Cillie's non-attendance at battle assemblies in March, April, and May of 2014. Clayton Decl. ¶ 10; *see also id.* at 9–10 (Letter from Christopher J. Cillie to ABCMR (Apr. 10, 2017)).

On May 8, 2017, Mr. Cillie allegedly sent a letter and an application to the ABCMR requesting the involuntary separation flag be removed from his file as erroneous "and the absences upon which the separation was based be changed to excused." Compl. ¶ 39.

On March 12, 2018, Mr. Cillie allegedly submitted claims for damages due to the unreimbursed credit card charge and debt collection effort against him in 2014. *Id.* ¶ 40.

On March 27, 2018, Mr. Cillie allegedly received a notification of a second involuntary separation action initiated against him. *Id.* ¶ 41. Mr. Cillie allegedly responded by letter two days later, pointing out defects in the action and asserting that the involuntary separation action was retaliation for Mr. Cillie's November 2016 Whistleblower Complaint. *Id.*

On June 8, 2018, the Army allegedly "held a Board of Inquiry in connection with the" separation action, but allegedly no separation resulted. *Id.* ¶ 42.

In July of 2018, Mr. Cillie allegedly received a record of the Board of Inquiry proceedings. In the record, he allegedly discovered an order discharging him from the Army Reserve dated June 8, 2018, and a subsequent order revoking the discharge. *Id.* ¶ 43. Subsequently, a member of Mr. Cillie's unit allegedly placed a copy of the separation order, but not the revocation order, in his record. *Id.* ¶ 44.

On August 27, 2018, Mr. Cillie submitted an application to the ABCMR requesting that corrections be made to his military record, including the removal of his referred evaluation and a change to the decision denying Mr. Cillie's request for a commander's inquiry into that evaluation. Clayton Decl. ¶ 10; *see also* Clayton Decl. at 11–14 (Letter from Christopher J. Cillie to ABCMR (Apr. 10, 2017)).

On January 3, 2019, Mr. Cillie allegedly received a letter from the Defense Finance and Accounting Service ("DFAS") stating that he owed $6,700 to the government, due on February 3, 2018, allegedly as a result of the discharge order placed in his file. Compl. ¶ 44.

On January 15, 2019, Mr. Cillie request for reconsideration and hearing on his May 2018 application for correction of military records. Clayton Decl. ¶ 9; *see also* Clayton Decl. at 7–8 (Letter from Christopher J. Cillie to ABCMR (Jan. 15, 2019)).

On January 16, 2019, Mr. Cillie allegedly submitted to the inspector general a list of documents which he alleges were omitted from the separation packet associated with the November 2016 Notification of the first involuntary separation action. Compl. ¶ 45.

On January 30, 2019, Mr. Cillie allegedly "paid the debt in full, and requested a DFAS review of the debt[,] and petitioned DFAS for a hearing in connection with the debt." *Id.* ¶ 46. DFAS allegedly accepted the payment, and it then allegedly denied the request for review and hearing regarding the debt. *Id.*

On March 5, 2019, Mr. Cillie allegedly followed up on his May 2017 application with the ABCMR to remove the involuntary separation flag be removed from his record, allegedly adding evidence and requesting an evidentiary hearing before the ABCMR. *Id.* ¶ 47.

### B. Procedural History

On March 7, 2019, Mr. Cillie filed his Complaint. Compl.

On September 3, 2019, Secretary McCarthy filed a motion to dismiss for lack of jurisdiction. Def.'s Mot. In support of his motion, Secretary McCarthy filed a memorandum of law and a declaration from Kenneth Clayton, Paralegal Specialist with the U.S. Army Legal Services Agency, along with several attachments to Mr. Clayton's declaration. Mem. of Law in Supp. of Def.'s Mot. to Dismiss, ECF No. 11-1 (Sept. 3, 2019) ("Def.'s Mem."); Clayton Decl.

On November 7, 2019, Mr. Cillie filed an objection to Defendant's motion to dismiss. Obj. to Def's Mot. to Dismiss, ECF No. 23 (Nov. 7, 2019) ("Pl.'s Obj."). In support of his objection, Mr. Cillie filed a memorandum of law and twenty-one exhibits, consisting of his applications for correction of military record and related correspondence between Mr. Cillie and United States Army personnel. Mem. of Law in Supp. of Pl.'s Obj. to Def.'s Mot. to Dismiss, ECF No. 23-1 (Nov. 7, 2019) ("Pl.'s Mem."); Pl.'s Exs. A–H, ECF No. 23-2 (Nov. 7, 2019); Pl.'s Exs. I–N, ECF No. 23-3 (Nov. 7, 2019); Pl.'s Exs. O–U, ECF No. 23-4 (Nov. 7, 2019).

On November 21, 2019, Secretary McCarthy moved to stay proceedings pending a final agency decision by the ABCMR on Mr. Cillie's applications for correction of his military record. Mot. to Stay, ECF No. 24 (Nov. 21, 2019).

On December 26, 2019, Mr. Cillie objected to Secretary McCarthy's motion to stay, arguing that "plaintiff has exhausted his administrative remedies before the agency because the

agency has not acted on the applications identified in the memorandum." Mem. of Law in Supp. of Pl.'s Obj. to Def.'s Mot. to Stay, ECF No. 26 at 1 (Dec. 26, 2019) ("Pl.'s Obj. to Stay").

On May 22, 2020, Secretary McCarthy filed a notice informing the Court that the ABCMR had reached a decision in Mr. Cillie's oldest application for correction of military record (filed April 10, 2017), and that Mr. Cillie had received a copy of the decision by e-mail. Notice of Agency Decision, ECF No. 27 (May 22, 2020). Defendant requested "reasonable time to prepare a filing with respect to the impact of this decision on Mr. Cillie's pending claims." *Id.*

On May 27, 2020, the Court granted Defendant's request and directed him to "file something with respect to the impact of the recent decision by the Army Board for Correction of Military Records on this case by July 2, 2020." Order, ECF No. 28 (May 26, 2020).

On July 2, 2020, Secretary McCarthy filed a response regarding the impact of the ABCMR's decision on Mr. Cillie's claims, withdrew his motion to stay, requested that the Court accept this filing as a reply in further support of his motion to dismiss, and further requested entry of a scheduling order. Req. for Sched. Order, Withdrawal of Mot. to Stay, and Reply in Supp. of Mot. to Dismiss, ECF No. 29 (July 2, 2020) ("Def.'s Reply").

On July 16, 2020, Mr. Cillie filed a response to Secretary McCarthy's latest filing, objecting to the request for a scheduling order, responding to the reply in support of the motion to dismiss, and requesting leave to amend his Complaint. Resp. to Def.'s Reply and Obj. to Events on Def.'s Proposed Sched. Order, ECF No. 30 (July 20, 2020) ("Pl.'s Sur-reply").

On August 14, 2020, having obtained permission from the Court, Secretary McCarthy filed a sur-reply in response to Mr. Cillie's request to amend and objections to the scheduling order. ECF No. 35 (Aug. 14, 2020) ("Def.'s Sur-reply").

On August 19, 2020, the Court held a hearing by videoconference on Secretary

McCarthy's motion to dismiss. Minute Entry, ECF No. 36 (Aug. 19, 2020).

## II.    STANDARD OF REVIEW

### A.  Rule 12(b)(1) Motions to Dismiss

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure raises

the issue of subject matter jurisdiction. In order for a court to exercise subject matter jurisdiction,

either (1) the plaintiff must set forth a colorable claim arising under the U.S. Constitution or a

federal statute, thus invoking this Court's federal question jurisdiction under 28 U.S.C. § 1331;

or (2) there must be complete diversity of citizenship between the plaintiff and the defendant and

the amount in controversy must exceed $75,000 under 28 U.S.C. § 1332. *See DaSilva v. Kinsho

Int'l Corp.*, 229 F.3d 358, 363 (2d Cir. 2000) (identifying and discussing the two categories of

subject matter jurisdiction). "If the court determines at any time that it lacks subject-matter

jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Thus, where jurisdiction

is lacking, dismissal is mandatory. *Lydonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697,

700–01 (2d Cir. 2000); *Manway Constr. Co. v. Hous. Auth. of Hartford*, 711 F.2d 501, 503 (2d

Cir. 1983).

Under Federal Rule of Civil Procedure 12(b)(1), the facts alleged in the complaint are

viewed in the light most favorable to the plaintiff and all reasonable inferences must be drawn in

the plaintiff's favor. *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) ("When

reviewing a district court's Rule 12(b)(1) determination of its subject matter jurisdiction, we

review factual findings for clear error and legal conclusions de novo. . . . Moreover[,] the court

must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of

plaintiff." (internal quotations and citations omitted)).

"On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits." *Karlen ex rel. J.K. v. Westport Bd. of Educ.*, 638 F. Supp. 2d 293, 298 (D. Conn. 2009).

### B. Rule 12(b)(6) Motions to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the

plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

Complaints filed by *pro se* plaintiffs "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F. 3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F. 3d 90, 101–02 (2d Cir. 2010) (discussing the "special solicitude" courts afford *pro se* litigants).

## III.   DISCUSSION

Mr. Cillie alleges that Defendant violated the Administrative Procedure Act, 5 U.S.C. § 706., by (1) denying his 2015 request for a commander's inquiry, and (2) denying his November 2016 whistleblower reprisal complaint, and (3) constructively denying his applications to correct his record. Compl. ¶¶ 51–54. He alleges further that these actions and inactions violated his

rights under the Due Process Clause of the United States Constitution. *Id.* ¶¶ 70–74. He seeks damages and injunctive relief. *Id.* at 16–17.

Defendant argues that Mr. Cillie's Administrative Procedure Act claim should be dismissed for lack of jurisdiction, and that both his Administrative Procedure Act and Due Process Clause claims should be dismissed for failure to state a claim. Def.'s Mem. at 1–2.

## A.  Subject Matter Jurisdiction

"[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived." *United States v. Cotton*, 535 U.S. 625, 630 (2002). "[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety. . . ." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

Under the Administrative Procedure Act, a court may only review an agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. A court "may not even entertain the claim against the agency . . . if the plaintiff[ ] ha[s] an adequate alternative legal remedy against someone else." *N.Y.C. Emps.' Ret. Sys. v. Sec. & Exch. Comm'n*, 45 F.3d 7, 14 (2d Cir. 1995); *see also Sharkey v. Quarantillo*, 541 F.3d 75, 84 (2d Cir. 2008) (noting that the Administrative Procedure Act does not independently grant subject-matter jurisdiction and that its provisions cannot override other more specific "statutory limitations on judicial review of agency action"); *Azan-Khan v. Barr*, No. 3:18-cv-1393 (VAB), 2019 WL 5653653, at *8 (D. Conn. Oct. 31, 2019) (dismissing APA claim for lack of subject matter jurisdiction "[b]ecause [plaintiff] has an alternative adequate remedy under Section 1421(c), for de novo review of USCIS's denial of his naturalization application").

Secretary McCarthy argues that the Court lacks jurisdiction over Plaintiff's Complaint for three reasons: (1) "Plaintiff has failed to exhaust his administrative remedies as he currently has

multiple cases pending at the ABCMR that involve matters central to his [C]omplaint;" (2) "there are no final agency actions in this matter that would trigger judicial review under the APA;" and (3) "Plaintiff is currently pending involuntary separation from the Army and prudential considerations counsel against judicial review at this time." Def.'s Mem. at 9. Defendant concedes that his motion to dismiss is now "moot with respect to the April 10, 2017 application, due to the ABCMR's April 14, 2020 decision acting on (and denying)" Mr. Cillie's April 10, 2017 application to correct his record regarding his non-attendance at battle assemblies in March, April, and May of 2014. Def.'s Reply at 2. Defendant maintains, however, that the Court lacks jurisdiction over Mr. Cillie's claims with respect to all but his April 10, 2017 application. *Id.* at 4.

Mr. Cillie contends that Defendant's "inaction on [his] applications for correction of records constitute[s] constructive denial of [his] application and [is] therefore final agency action" subject to review by this Court. Compl. ¶ 51; *see also* Pl.'s Mem. at 3–4 (citing *Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. U.S. Dep't of State*, 300 F. Supp. 3d 540 (S.D.N.Y. 2018); *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52 (D.C. Cir. 1987)). He argues that the ABCMR has failed to meet two statutory deadlines for resolving his applications.

First, he argues that the ABCMR has constructively denied his applications because, under 10 U.S.C. § 1557(b), "Final Action by a Corrections Board on all applications . . . shall be completed within 18 months of receipt" by the Army Board. Pl.'s Mem. at 4 (quoting 10 U.S.C. § 1557(b)).

Second, relying on the Military Whistleblower Protection Act, 10 U.S.C. § 1034, he contends that the ABCMR was required to issue final decisions on his applications for correction of records that allege prohibited personnel actions within 180 days of the application. *Id.* (citing

10 U.S.C. § 1034(g)(4) ("If the Secretary fails to issue such a final decision within that time, the member . . . [of the military] shall be deemed to have exhausted . . . [his] administrative remedies under [10 U.S.C. § 1552].")).

Secretary McCarthy argues in reply that Mr. Cillie has not met his burden under the Administrative Procedure Act of proving that the Army Board was "unreasonably delayed" in its decisions, and that Mr. Cillie's reliance on *Brennan* is misplaced. Def.'s Reply at 4. In Defendant's view, "[o]nce the ABCMR issues its final decision(s) with respect to [Mr. Cillie's] pending applications, *if* those decisions are unfavorable to [Mr.] Cillie, he may then return to federal court to seek redress." *Id.* (citing *Jones v. N.Y. State Div. of Military & Naval Affairs*, 166 F.3d 45, 52, 54–55 (2d Cir. 1999); *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Mr. Cillie argues again in his sur-reply that the Court has subject matter jurisdiction under 10 U.S.C. § 1034, and that *Jones* and *Bennett* are not controlling because they do not address applications for correction of military records. Pl.'s Sur-reply at 5–7. He also argues that the ABCMR "has had more than enough time to act—in the case of an application submitted by the Plaintiff on January 5, 2015 for more than five years—and yet has failed to do so," thus unreasonably delaying action under the APA. *Id.* at 8. He argues further that the ABCMR has not even acknowledged or assigned case numbers to nine of his applications,[6] and therefore that it would be inappropriate to dismiss Plaintiff's Complaint with respect to any applications because it is unclear to which applications the dismissal would apply. *Id.* at 7.

Secretary McCarthy argues in his sur-reply that, given Mr. Cillie's now stated intent to ask the ABCMR to reconsider its April 14, 2020 decision, that agency decision is not final, and

---

[6] Mr. Cillie identifies those applications unacknowledged by the ABCMR as applications he filed on January 5, 2015; March 27, 2016; March 28, 2016; April 10, 2016; January 5, 2017; April 16, 2017; August 27, 2018; August 29, 2018; and March 5, 2019. Pl.'s Sur-reply at 7 n.18.

the Complaint should be dismissed in its entirety. Def.'s Sur-reply at 8. He argues further that to the extent Mr. Cillie relies on the Military Whistleblower Protection Act, those claims are barred because he has not alleged that that he filed a Military Whistleblower Protection Act complaint within the one year deadline under 10 U.S.C. 1034(c)(5), he has not specified that any applications fall under the Military Whistleblower Protection Act, and he has not provided the Court with any such complaints for review. *Id.* at 2–7.

The Court agrees.

Under the Administrative Procedure Act, plaintiffs may petition a federal court for review of a final agency decision for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

> Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

*Id.* This section requires both finality of an agency decision and "exhaustion of all intra-agency appeals mandated either by statute or by agency rule." *Darby v. Cisneros*, 509 U.S. 137, 147 (1993).

"The finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury," while "the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Brezler v. Mills*, 86 F. Supp. 3d 208, 216 (E.D.N.Y. 2015) (quoting *Darby*, 509 U.S. at 144) (internal citations, quotation marks, and alterations omitted). "Judicial intervention into the agency process denies the agency an opportunity to correct its own

mistakes and to apply its expertise . . . [and] leads to piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary." *U.S. ex rel. The Saint Regis Mohawk Tribe v. President R.C.—St. Regis Mgmt. Co.*, 451 F.3d 44, 50 (2d Cir. 2006) (quoting *FTC v. Standard Oil*, 449 U.S. 232, 242 (1980) (internal quotation marks omitted)), *as corrected* (June 27, 2006).

Under *Darby*, "courts can impose an exhaustion rule only when expressly required by statute." *Brezler*, 86 F. Supp. 3d at 215 (citing *Darby*, 509 U.S. at 144 (where the Administrative Procedure Act applies, "an appeal to 'superior agency authority' is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review")). Courts have found that this limitation on the exhaustion rule for Administrative Procedure Act claims applies in the military context. *See Manker v. Spencer*, No. 3:18-cv-372 (CSH), 2019 WL 5846828, at *7 (D. Conn. Nov. 7, 2019) ("[T]he Supreme Court's decision in *Darby* and the plain language of the APA preclude the Defendant Secretary of the Navy from imposing an exhaustion of administrative remedy requirement upon" plaintiffs); *Doolen v. Esper*, No. 16 CV 8606 (VB), 2018 WL 4300529, at *12 (S.D.N.Y. Sept. 10, 2018) ("Under *Darby* . . . , federal courts have no authority to require plaintiffs to exhaust administrative remedies prior to seeking judicial review under the APA unless a statute or agency regulation 'clearly mandates' exhaustion as a prerequisite to judicial review. Here, no such requirement exists. Accordingly, plaintiff's APA claim is not barred for failure to appeal to the ABCMR." (citing *Connors v. United States*, 863 F.3d 158, 160 (2d Cir. 2017))); *Crane v. Sec'y of the Army*, 92 F. Supp. 2d 155, 161–62 (W.D.N.Y. 2000) ("Almost without exception, federal courts throughout the country have also declined to create a military exception to the Court's decision in *Darby*.").

Even if exhaustion is not required, however, finality of an agency decision is mandatory before judicial review. *See Brezler*, 86 F. Supp. 3d at 216 ("[I]t is well established that 'the APA explicitly requires that an agency action be final before a claim is ripe for review.'" (quoting *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999)); *Top Choice Distribs., Inc. v. U.S. Postal Serv.*, 138 F.3d 463, 466 (2d Cir. 1998) ("Finality is an explicit requirement of the APA, while exhaustion is a judge-made creation[.]").

Mr. Cillie concedes that the ABCMR has not ruled on all but one of his pending applications for correction of his record. *See e.g.,* Pl.'s Sur-reply at 2–3 ("Each of the January 5, 2017 application, the April 10, 2017 application, the May 8, 2017 application, and the March 5, 2019 application are pending before the ABCMR."). But he argues, relying on *Brennan*, 300 F. Supp. 3d 540, and *Spannaus*, 824 F.2d 52, that the ABCMR has constructively denied his applications under 10 U.S.C. § 1557(b) by failing to rule on them within eighteen months, and under the Military Whistleblower Protection Act, 10 U.S.C. § 1034, by failing to issue final decisions within 180 days of receiving the applications. Pl.'s Mem. at 3–4.

Mr. Cillie's reliance on *Brennan* and *Spannaus*, however, is misplaced. Those cases only articulate that a plaintiff has constructively exhausted his remedies upon the expiration of a statutory deadline for Freedom of Information Act ("FOIA") claims. *See Brennan*, 300 F. Supp. 3d at 546 ("An agency's failure to comply with [FOIA's] time limits may be treated as 'constructive exhaustion' of administrative remedies,' and authorizes 'the requester to seek judicial review immediately.'" (quoting *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 36 (D.D.C. 2006))); *Spannaus*, 824 F.2d at 58 ("By virtue of a special provision virtually unique to FOIA, exhaustion is complete—for purposes of allowing recourse to the courts—on the expiration of specified deadlines") (citing 5 U.S.C. 552(a)(6)(C) (footnote omitted)).

21

Mr. Cillie cites to no authority, nor can this Court identify any, suggesting that this statutory provision, "virtually unique to FOIA," also applies to the ABCMR—or to the failure of any other board for corrections of military records to act within the eighteen-month timeline set forth under 10 U.S.C. § 1557(b). Indeed, the statutory text suggests that the eighteen-month timeline is intended as an internal guideline for efficiency, rather than a deadline giving rise to an applicant's right to seek judicial review. *See* 10 U.S.C. § 1557(d) ("Failure of a Corrections Board to meet the applicable timeliness standard for any period of time under subsection (a) or (b) does not confer any presumption or advantage with respect to consideration by the board of any application."); *id.* at § 1557(e) ("The Secretary of the military department concerned shall submit to [Congress] a report not later than June 1 following any fiscal year during which the Corrections Board of that Secretary's military department was unable to meet the applicable timeliness standard for that fiscal year under subsections (a) and (b). . . . specify[ing] the reasons why the standard could not be met and the corrective actions initiated to ensure compliance in the future.").

Nor does the 180-day deadline for the ABCMR to act on applications within the scope of the Military Whistleblower Protection Act trigger judicial reviewability, to the extent that Mr. Cillie's applications are covered by that statute.[7]

---

[7] As Defendant points out, it is unclear on the face of the Complaint what applications Mr. Cillie alleges are covered by the Military Whistleblower Protection Act. *See* Def.'s Sur-reply at 5–6. The first alleged application of which the Court is aware, either from the Complaint or from Defendant's exhibits, is from April 10, 2017. *See* Clayton Decl. at 9–10 (Letter from Christopher J. Cillie to ABCMR (Apr. 10, 2017)). Mr. Cillie thus submitted this application three years after the allegedly retaliatory actions of March 2014. By this time, the Investigations Division had already sent Mr. Cillie a letter informing him that "no investigation [into whistleblower reprisal allegations] is required when a service member submits a reprisal complaint more than one year after the date that the member became aware of the personnel action that is the subject of the allegation," and dismissing Mr. Cillie's November 2016 complaint regarding actions in 2014 and 2015 as untimely. Compl. ¶ 37; *see* 10 U.S.C. § 1034(c)(5) (a complaint to the inspector general under the MWPA must be filed within "one year after the date on which the member becomes aware of the personnel action that is the subject of the allegation"). Mr. Cillie refers to earlier complaints in his sur-reply, *See* Pl.'s Sur-reply at 7 n.18 (referencing complaints he allegedly filed on January 5, 2015; March 27, 2016; March 28, 2016; April 10, 2016; January 5, 2017), but he has not alleged any facts regarding these alleged

The Military Whistleblower Protection Act provides that "[a] board for the correction of military records acting under" 10 U.S.C. § 1552 may review a matter under the Military Whistleblower Protection Act "in resolving an application for the correction of records made by a member or former member of the armed forces who has alleged a personnel action prohibited by" the MWPA. 10 U.S.C. § 1034(g)(1). The Secretary of the "concerned" military department then is required to issue a final decision within 180 days of receiving the application. 10 U.S.C. § 1034(g)(4). "If the Secretary fails to issue such a final decision within that time, the member or former member shall be deemed to have exhausted the member's or former member's administrative remedies under [10 U.S.C. § 1552]." *Id.*; *see also Wilson v. James*, 139 F. Supp. 3d 410, 433 (D.D.C. 2015) (quoting same), *aff'd*, No. 15-5338, 2016 WL 3043746 (D.C. Cir. May 17, 2016).

This provision only means, however, that Mr. Cillie "becomes eligible to appeal to the Secretary of Defense" after 180 days—not that he may bring an action in federal court after such time has elapsed. *Rodriguez v. Penrod*, No. 1:18-cv-00240 (CJN), 2020 WL 686012, at *12 (D.D.C. Feb. 11, 2020); *see* 32 C.F.R. § 581.3(g)(3)(ii) ("The Secretary of the Army will issue decisions on cases covered by the" MWPA within 180 days of receipt of the application, and "[u]nless the full relief requested is granted, these applicants will be informed of their right to request review of the decision by the Secretary of Defense.").

As a result, Mr. Cillie has not shown that the ABCMR constructively denied his applications and therefore is eligible for judicial review. Thus, there is no final agency action for this Court to review.

---

complaints, nor has he presented them to the Court. Thus, the Court has no way to evaluate whether these complaints might fall under the Military Whistleblower Protection Act.

Even with respect to the April 10, 2017 application, which the ABCMR has now denied, the agency decision is not final.

The Supreme Court has interpreted the finality requirement for judicial review under the Administrative Procedure Act "in a 'pragmatic way.'" *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016) (quoting *Sharkey*, 541 F.3d at 84); *see also Paskar v. U.S. Dep't of Transp.*, 714 F.3d 90, 97–98 (2d Cir. 2013) (considering the "substantial practical impact" of an agency's letter in deciding if it was a final agency decision). The Supreme Court has articulated two conditions that must be satisfied for an agency action to be final: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Salazar*, 822 F.3d at 82 (internal quotation marks omitted) (quoting *Bennett*, 520 U.S. at 177–78).

Mr. Cillie's April 10, 2017 application to the ABCMR requests that a separation packet be corrected to, among other things, remove a negative officer evaluation report that included allegedly false records of non-attendance at the battle assemblies in March, April, and May 2014. *See* Clayton Decl. at 9–10 (Letter from Christopher J. Cillie to ABCMR (Apr. 10, 2017)). But it appears that Mr. Cillie requested corrections relating to the same alleged negative officer evaluation report and allegedly false records of non-attendance in multiple applications to the ABCMR. *See* Compl. ¶¶ 39, 47 (referring to May 8, 2017, application, and follow up in March 2019); Clayton Decl. at 7–8 (Letter from Christopher J. Cillie to ABCMR (Jan. 15, 2019)); Clayton Decl. at 11–14 (Letter from Christopher J. Cillie to ABCMR (Aug. 27, 2018)).

Additionally, Mr. Cillie is "currently subject to involuntary separation proceedings and a decision by the separation authority is pending." Clayton Decl. ¶ 12. These multiple pending

applications regarding the same or related underlying issues suggest that, considering its "substantial practical impact," the ABCMR's decision on Mr. Cillie's April 10, 2017 does not "mark the consummation of the agency's decisionmaking process" with respect to Mr. Cillie's underlying grievances." *Salazar*, 822 F.3d at 82.

Even if the ABCMR's April 14, 2020 decision on Mr. Cillie's April 10, 2017 application were final, prudential concerns weigh in favor of dismissal without prejudice.

Defendant argues that "the facts of Plaintiff's involuntary separation proceedings are intertwined with the matters alleged in his [C]omplaint, and the result of the involuntary separation action may result in additional administrative review within the Army and perhaps additional civil litigation down the road." Def.'s Mem. at 15. In his view, this dispute would "benefit from additional factual development and is in many ways contingent on future events." *Id.* (internal quotation marks omitted) (quoting *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 133 (2d Cir. 2008)).

The Court agrees.

"Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08, (2003) (internal quotation marks omitted). "[W]hen a court declares that a case is not prudentially ripe, it means that the case will be better decided later . . . . [not] that the case is not a real or concrete dispute affecting cognizable current concerns of the parties." *Connecticut v.*

*Duncan*, 612 F.3d 107, 113–14 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Grandeau*, 528 F.3d at 131).

Here, because the ABCMR is continuing to evaluate Mr. Cillie's claims through various pending applications, prudential ripeness considerations weigh in favor of dismissal so as to avoid the Court becoming "embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial." *Grandeau*, 528 F.3d at 131. Further administrative review will also enhance the factual basis for any later judicial review. *See Duncan*, 612 F.3d at 114 ("While the District Court is capable of resolving this factual and legal dispute, administrative proceedings are a more suitable venue because they will allow for fact-intensive inquiries related to . . . the agency's area of expertise.").

Moreover, significantly, Mr. Cillie himself has now indicated that he wishes to bring alleged errors in the ABCMR's decision "to the ABCMR so that the ABCMR can correct the error through reconsider[ation of] the April 14, 2020 decision—rather than invite the Court to decide whether a decision making no factual findings relating to the underlying application and relief requested is administratively unsound." Pl.'s Reply at 10.

The Court will permit Mr. Cillie to do so.

Accordingly, because the ABCMR has not ruled on the majority of Mr. Cillie's applications, and because Mr. Cillie will seek reconsideration from the ABCMR of its decision on his April 10, 2017 application, the Court will dismiss Mr. Cillie's Administrative Procedure Act claims, without prejudice, for lack of subject matter jurisdiction. *See Cunningham v. Loy*, 76 F. Supp. 2d 218, 221 (D. Conn. 1999) ("By dismissing this action without prejudice, Cunningham will first exhaust his administrative appeals with the [Coast Guard Board of

Correction of Military Records (CGBCMR)], and thereafter seek judicial review of that final decision, if appropriate, recognizing that the CGBCMR may 'obviate[] any need for any judicial interference in military affairs,' or at the very least, will clarify the factual record and thereby facilitate subsequent judicial review." (quoting *Jones*, 166 F.3d at 54)) *Janniere v. U.S. Army*, 34 F. Supp. 2d 850, 853 (E.D.N.Y. 1999) ("Until the ABCMR acts upon [his] application[s], [P]laintiff's administrative remedies have not been exhausted.)"; *see also In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 156 (2d Cir. 2015) ("Article III court must be sure of its own jurisdiction before getting to the merits." (internal citation and quotation marks omitted)).[8]

---

[8]     To the extent Mr. Cillie seeks judicial review in the future of final decisions by the ABCMR, he must clearly allege which applications and which ABCMR decisions form the basis of his complaint. In this Complaint, he alleges generally, and with internal inconsistency, that "Defendant's inaction on the applications for correction of records constitute constructive denial of the application and are therefore final agency action." Compl. ¶ 51. But he specifically refers to only one application to the ABCMR: the one he filed on May 8, 2017, *id.* ¶ 39, and supplemented in March 2019, *id.* ¶ 47.

Yet, in his briefs in response to the motion to dismiss, he refers to multiple applications. *See, e.g.*, Pl.'s Sur-reply at 7 n.18 (listing nine applications allegedly unacknowledged by the ABCMR). And Defendant assumes that Mr. Cillie intends to seek review of every application he has filed with the ABCMR. *See, e.g.*, Def.'s Reply at 2, 4 (conceding that the Court has jurisdiction over Mr. Cillie's April 10, 2017 application to correct his record but lacks jurisdiction over his other applications).

Without factual allegations specifying which applications Mr. Cillie seeks review of, and why, even if there is jurisdiction, his alleged Administrative Procedure Act claim or claims cannot be properly evaluated. *See* Fed. R. Civ. P. 8(a), (d) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief. . . . Each allegation must be simple, concise, and direct."); *see also Iqbal*, 556 U.S. at 679 ("only a complaint that states a plausible claim for relief survives a motion to dismiss").

### B.  Due Process Claim under the Due Process Clause

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). To determine whether a procedural due process violation has occurred, courts first "ask whether there exists a liberty or property interest of which a person has been deprived," and, if so, "whether the procedures followed by the State were constitutionally sufficient." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (quoting *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011)).

Mr. Cillie alleges that the ABCMR violated the "due process protections of the Fifth Amendment to the U.S. Constitution," which "require that a federal agency conduct adjudications in a fair and orderly manner," by failing to act on his applications and failing to act on his requests for investigations. Compl. ¶¶ 70–74.

Secretary McCarthy argues that Mr. Cillie has simply "restyle[d] his APA claim as a Fifth Amendment procedural due process violation, relying on the central argument that the Army did not follow its own rules and regulations." Def.'s Mem. at 16. Defendant argues further that Mr. Cillie "fails to identify a property or liberty interest for which he must be afforded due process." *Id.*

The Court agrees.

Mr. Cillie's alleged due process claim essentially restates his Administrative Procedure Act claim, arguing that the ABCMR failed to act on his applications for review. In any event, he has not alleged that he was deprived of any liberty or property interest. Even if he had, he would

be required to exhaust his administrative remedies before raising these alleged claims in federal court. *See Brezler*, 86 F. Supp. 3d at 217 ("Perhaps mindful of the procedural hurdles to presenting claims under the APA, plaintiff has also styled his case as a freestanding constitutional challenge to the disciplinary proceedings under the Due Process clause. Constitutional claims brought independently of the APA are not subject to the finality requirement. However, because such claims also operate outside the scope of *Darby*, the exhaustion rule applies to such claims as a matter of judicial discretion."); *Hamblet v. Brownlee*, 319 F. Supp. 2d 422, 426 (S.D.N.Y. 2004) ("[T]he exhaustion doctrine continues to apply as a matter of judicial discretion in cases not governed by the APA." (citing *Darby*, 509 U.S. at 153)); *Janniere*, 34 F. Supp. 2d at 853 ("[P]laintiff alleges a lack of due process, lack of representation and lack of other constitutional safeguards. Here, as in *Guitard*, 967 F.2d at 739, these constitutional claims can be heard by the administrative agency and are not properly treated as giving rise to an exception to the exhaustion requirement.").

As a result, the Court will dismiss Mr. Cillie's due process claim.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **GRANTED**, and Plaintiff's Complaint is dismissed in its entirety without prejudice.

The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 21st day of August, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE